**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

```
_____
                                   )
JRF COASTAL ENTERPRISES, LLC,      )
d/b/a SERVPRO OF                   )
SALEM/PEABODY/MARBLEHEAD,          )
                                   )
                 Plaintiff,        )        Civil Action
                                   )        No. 24-cv-11171-PBS
v.                                 )
                                   )
NATIVE ENERGY & TECHNOLOGY, INC.,  )
                                   )
                 Defendant.        )
_____)
```

**MEMORANDUM AND ORDER**

January 16, 2026

Saris, J.

**INTRODUCTION**

This case arises from a contract to address flooding at an Internal Revenue Service ("IRS") facility in 2023. Defendant Native Energy & Technology, Inc. ("NET"), the IRS's prime contractor, hired Plaintiff JRF Coastal Enterprises, LLC ("JRF"), to provide mitigation and reconstruction services at the facility. After the work was completed, NET refused to pay portions of the invoices submitted by JRF. JRF, faced with bearing the costs of the work without full compensation, initiated this suit against NET.

Now before the Court are the parties' cross-motions for summary judgment and NET's motion to strike an affidavit submitted

by JRF. After a hearing, the Court concludes that JRF is entitled to summary judgment on its breach of contract claim, except with respect to one set of disputed charges over which a genuine dispute of material fact remains. The Court further concludes that genuine disputes of material fact remain with respect to JRF's claims of breach of the implied covenant of good faith and fair dealing and violation of Massachusetts General Laws Chapter 93A ("Chapter 93A").

Accordingly, JRF's motion for summary judgment (Dkt. 38) is **ALLOWED IN PART** and **DENIED IN PART**, and NET's motion for summary judgment (Dkt. 46) is **DENIED**. Because the Court does not rely on the disputed affidavit, NET's motion to strike (Dkt. 61) is **DENIED** as moot.

## BACKGROUND

The following facts are undisputed except where stated otherwise.

### I.   The Contract

In August 2023, an IRS building in Andover, Massachusetts, flooded several times. On August 8, 2023, the IRS contacted NET (the prime contractor for maintenance at the building) and provided NET's project manager, Kevin Cheney, with a list of companies that could provide emergency mitigation and reconstruction services. Cheney selected JRF and, later the same day, Joseph Turnbull, JRF's general manager, arrived on scene. Turnbull inspected the building

2

and asked Cheney to sign a Commercial Emergency Work Authorization Contract (the "Emergency Contract"). Cheney signed the Emergency Contract. The Emergency Contract incorporated by reference a Time and Materials rate sheet, which was executed by both parties.

The Emergency Contract provided that NET was "responsible for payment to [JRF] of the full costs included in the scope of work." Dkt. 42-1 at 2 (emphasis omitted). When it signed the Emergency Contract, NET intended to compensate JRF on a "pay-when-paid" basis, i.e., to pay amounts owed to JRF only after the IRS first paid those amounts to NET. The parties dispute whether Cheney informed Turnbull of this intention. The Emergency Contract did not include any language discussing a pay-when-paid arrangement, and the Time and Materials sheet required NET to pay all invoices to which it did not clearly object in writing within 30 days:

> All invoices are due and payable upon receipt and will be deemed late 30 days after receipt. If there are any disputed charges on any invoices, these must be clearly identified in writing within 30 days of receipt of invoice; provided, however, that any amounts not disputed in good faith must be paid within 30 days of receipt of invoice.

Dkt. 42-2 at 14.

## II.  JRF's Mitigation and Reconstruction Work

JRF immediately began work on the property on August 8, 2023. On August 10, Turnbull sent NET price estimates for flood mitigation and reconstruction work. Mitigation work was to consist of removal of damaged material and draining and drying of water

from the building. Reconstruction work was to follow, involving installation of new drywall, painting, reflooring, and other replacements.

Turnbull's price estimates used the prevailing wage to calculate labor expenses, and he told NET that JRF was paying its employees Davis-Bacon wages.[1] NET accepted these estimates and increased the price ceiling in its contract with the IRS. Throughout August, Turnbull sent NET and the IRS updated costs for the project, which were above the original estimates.

JRF completed the mitigation work by September 19, 2023, and substantially completed the reconstruction work by September 29, 2023. In the fall of 2023, JRF submitted initial invoices for the mitigation and reconstruction work. On October 2, 2023, Erick Rodas, the contract manager at NET assigned to the project, emailed Turnbull that he was working on JRF's payment and that NET's accounting department required JRF to sign a Master Services Agreement (the "MSA") to begin processing payment.

JRF and NET signed the MSA on October 4, 2023. The MSA stated that JRF "will maintain compliance with all applicable E-Verify, Service Contract Act, Davis Bacon, EEOC requirements, and EO

---

[1] The Davis-Bacon Act, 40 U.S.C. § 3141 et seq., requires certain federal contracts to include minimum hourly wage clauses. See Univs. Rsch. Ass'n v. Coutu, 450 U.S. 754, 756 (1981). The minimum wage, also known as the "prevailing wage," is set by the Secretary of Labor. See id.

13496." Dkt. 42-3 at 4. The MSA required submission of service orders before work could proceed, but no service orders were ever generated for work done by JRF, including work completed before execution of the MSA.

JRF claims that NET insisted on the MSA in an attempt to create a pay-when-paid system that the Emergency Contract did not include. According to JRF, Rodas was instructed by NET Chief Operating Officer Faye Morris to look through the Emergency Contract and communications between the parties to find language that would support a pay-when-paid obligation. NET denies any intent to circumvent the Emergency Contract's provisions, asserting instead that Rodas was simply told to figure out the parties' contractual framework.

On October 5, 2023, NET's IRS contact notified Rodas that the IRS was rejecting the JRF invoice because of the increase from the initial cost estimates. The IRS requested detailed receipts of all expenses and Certified Payroll Reports ("CPRs") for all workers. The same day, Rodas forwarded Turnbull a request for additional documentation. Turnbull and Rodas spoke over the phone, and Turnbull subsequently agreed to provide CPRs for hourly rate employees. Later on October 5, Rodas emailed Turnbull that the government had directed NET and JRF to stop all work on the project "until the money issues [were] resolved." Dkt. 42-7 at 2.

On November 27, 2023, Turnbull emailed Morris about both invoices, writing: "Can you please advise on when payment will be received for these invoices? It was our expectations [sic] to have received them by the end of the month." Dkt. 50-8 at 9. On November 29, Turnbull told Morris that JRF would resubmit the CPRs and ensure they aligned with the invoices. He also requested payment of any undisputed amounts by December 22.

## III. **The Final Invoices**

On December 4, 2023, JRF submitted a revised mitigation invoice (the "Final Mitigation Invoice") for $1,802,407.01 and the associated CPRs. On December 13, 2023, Turnbull emailed Morris and Alfred Edwards (another NET employee) a set of revised prevailing wage CPRs. The following day, Turnbull emailed Edwards to request payment on the undisputed amounts later that month.

On December 18, 2023, Turnbull emailed Morris and Edwards requesting an update on payment of the undisputed amounts and asking when the IRS would complete its review of the labor charges. Morris emailed Turnbull with a list of workers for Restoration Pro Labor -- a labor subcontractor hired by JRF -- whom Morris could not find on the CPRs. Morris claims she did not receive a response about these workers.

On December 19, Edwards emailed Turnbull and other JRF employees to ask why fringe pay was not distinguished on the Restoration Pro Labor CPRs. Approximately one week later, JRF sent

6

an updated CPR "to reflect the breakdown between rate of pay and fringe payout." Dkt. 50-10 at 2.

On December 26, 2023, JRF submitted an updated reconstruction invoice (the "Final Reconstruction Invoice") for $1,544,345.26. NET made partial payments to JRF, but has not paid JRF the full invoiced amount.[2]

## IV.  **The Lawsuit**

JRF filed this lawsuit in Massachusetts Superior Court on April 3, 2024. On May 1, 2024, NET removed the action to this Court.[3] In July 2024, the Court allowed NET's motion to dismiss JRF's claims for quantum meruit and promissory estoppel but denied the motion as to JRF's claims for breach of contract (Count I), breach of the implied warranty of good faith and fair dealing (Count II), and violation of Chapter 93A (Count V). See Dkt. 27. As to the Chapter 93A claim, the Court held that JRF had "plausibly stated that at the time [NET] executed the Emergency Contract with JRF," NET "had no intention of making payment . . . for services provided until after it had received payment from the IRS, which

---

[2] The total invoiced amount identified by JRF is $3,346,752.27, which is the sum of the amounts of the Final Mitigation Invoice and the Final Reconstruction Invoice.

[3] The Court has diversity jurisdiction over this action because JRF's sole members are citizens of New Hampshire, see Dkt. 65 ¶ 5, and NET is a Texas corporation with its principal place of business in Texas, see Dkt. 66 ¶ 2. See BRT Mgmt. LLC v. Malden Storage LLC, 68 F.4th 691, 695-96 (1st Cir. 2023).

was not a term in the [Emergency] [C]ontract." Id. These cross-motions for summary judgment followed.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine where the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party." Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 87 (1st Cir. 2018) (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23-24 (1st Cir. 2017)). "A fact is material" if "it has the potential of changing a case's outcome." Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018).

"The court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in [its] favor." Carlson v. Univ. of New Eng., 899 F.3d 36, 43 (1st Cir. 2018). Where parties cross-move for summary judgment, "the court must [examine] each motion separately, drawing inferences against each movant in turn." Vazquez-Velazquez v. P.R. Highways & Transp. Auth., 73 F.4th 44, 51 (1st Cir. 2023) (alteration in original) (quoting Viscito v. Nat'l Plan. Corp., 34 F.4th 78, 83 (1st Cir. 2022)).

**DISCUSSION**

I.   **Breach of Contract**

To prevail on a breach of contract claim under Massachusetts law, "the plaintiff must prove that a valid, binding contract existed, the defendant breached the terms of the contract, and the plaintiff sustained damages as a result of the breach." Minturn v. Monrad, 64 F.4th 9, 14 (1st Cir. 2023) (quoting Young v. Wells Fargo Bank, N.A., 828 F.3d 26, 32 (1st Cir. 2016)). There is no dispute that the Emergency Contract was a valid and binding contract and that JRF has not been paid in full for the work it performed, which leaves breach as the only issue currently before the Court. JRF contends that NET breached the Emergency Contract by failing to pay the full invoice amounts without properly objecting to any charges. NET contends that it disputed the labor charges in the invoices.

Before resolving this dispute, the Court must address two threshold arguments raised by NET.

A.   **NET's Threshold Arguments**

1.   *Accurate Invoices as a Condition Precedent*

First, NET argues that the submission of "accurate and substantiated labor charge billings" was "a condition precedent to payment" and that JRF's alleged failure to satisfy that requirement relieved NET of its obligation to pay. Dkt. 46 at 9.

The determination of whether contractual provisions are unambiguous, and the interpretation of unambiguous contractual provisions, are questions of law. See Minturn, 64 F.4th at 14. "A contract is ambiguous either where its 'terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of the words employed and obligations undertaken.'" Id. (quoting Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 783 (1st Cir. 2011)). Unambiguous terms "must be understood in their 'usual and ordinary sense,' and a contract should be interpreted 'in a reasonable and practical way, consistent with its language, background, and purpose.'" Gen. Hosp. Corp. v. Esoterix Genetic Lab'ys, LLC, 16 F.4th 304, 308 (1st Cir. 2021) (quoting Bukuras v. Mueller Grp., 592 F.3d 255, 262 (1st Cir. 2010)). A court will not consider extrinsic evidence of contractual meaning where the provision in question is unambiguous. See id.

A condition precedent is an event or condition that must occur before a contract imposes an obligation to perform. See Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 837 N.E.2d 1121, 1132 (Mass. 2005). "'[E]mphatic words' are generally" required "to create a condition precedent." Halstrom v. Dube, 116 N.E.3d 626, 630 n.8 (Mass. 2019) (quoting Mass. Mun. Wholesale Elec. Co. v. Town of Danvers, 577 N.E.2d 283, 288 (Mass. 1991)).

NET does not identify any language in the Emergency Contract that could be read to establish the accurate substantiation of invoices as a condition precedent to payment. Nor does any such language exist. On the contrary, the Time and Materials sheet unambiguously requires NET to dispute any charges "in writing within 30 days of receipt of [an] invoice." Dkt. 42-2 at 14. Absent a clear written objection, NET is required to pay each invoice within 30 days of receipt. The Court therefore disagrees with NET that the submission of an inadequate invoice, if not properly disputed, relieves NET of its obligation to pay.

 2. *Certified Payroll Reports and Material Breach*

NET's second threshold argument is that JRF materially breached the Emergency Contract by failing to submit accurate CPRs, thereby relieving NET of its obligation to perform. "A material breach of an agreement occurs when there is a breach of 'an essential and inducing feature of the contract[].'" Teragram Corp. v. Marketwatch.com, Inc., 444 F.3d 1, 11 (1st Cir. 2006) (alteration in original) (quoting Lease-It, Inc. v. Mass. Port Auth., 600 N.E.2d 599, 602 (Mass. App. Ct. 1992)). When one party materially breaches a contract, the other party is "excuse[d] . . . from further performance." Id. (quoting Lease-It, Inc., 600 N.E.2d at 602). While the materiality of a breach is generally a factual question, it becomes a question of law when the evidence is "either undisputed or sufficiently lopsided." Id.

(quoting Gibson v. City of Cranston, 37 F.3d 731, 736 (1st Cir. 1994)).

The parties dispute whether JRF was required to pay its workers prevailing wage under the Davis-Bacon Act. They point out that the Emergency Contract and the Time and Materials sheet contain varying language regarding this obligation. Compare Dkt. 42-1 at 2 ("General labor . . . may be subject to prevailing wage . . . ." (emphasis added)), with Dkt. 42-2 at 10 ("Labor is subject to prevailing wage . . . . In such events, General Labor will be charged at presented invoice plus 35% or standard labor rate, whichever is greater." (emphasis added)).

The Court need not resolve whether JRF's labor was subject to prevailing wage, however, because even if it was, JRF's purported failure to submit adequate CPRs still would not constitute a material breach of the Emergency Contract. Several factors inform this conclusion. First, there is no clause in the Emergency Contract that requires the reporting of CPRs in any form. Second, the relevant federal regulations make clear that prevailing wage clauses and payroll reporting clauses are different. Compare 29 C.F.R. § 5.5(a)(1) (requiring insertion of prevailing wage clauses), with id. § 5.5(a)(3)(ii) (same as to certified payroll clauses). Therefore, even if the Emergency Contract did include a prevailing wage clause that conformed with regulatory requirements, it certainly did not include such a clause with

12

respect to certified payroll reporting, which is viewed as a distinct contractual component under the relevant regulations.

Third, even assuming JRF did fail to meet its Davis-Bacon payroll reporting obligations, NET provides no legal basis for the notion that the proper recourse is for NET to refuse to pay JRF. Regulations promulgated under the Davis-Bacon Act provide that "[i]n the event of any violations" of payroll reporting and other clauses, "the prime contractor and any subcontractor(s) responsible will be liable [to workers] for any unpaid wages and monetary relief . . . and may be subject to debarment." Id. § 5.5(a)(6). They do not, however, provide that the prime contractor may, before any such violations are established, refuse to pay the subcontractor where the prime contractor has itself failed to include a required clause in the relevant subcontract. See United States ex rel. D.L.I. Inc. v. Allegheny Jefferson Millwork, LLC, 540 F. Supp. 2d 165, 176-77 (D.D.C. 2008) (holding that contractor could not "back charge" subcontractor for alleged Davis-Bacon Act violations where subcontract did not shift liability for such violations to subcontractor). On the contrary, the regulations provide that the "prime contractor is responsible for the submission of all certified payrolls by all subcontractors." 29 C.F.R. § 5.5(a)(3)(ii)(A).

Accordingly, the Court concludes that NET was obligated to pay invoices submitted by JRF unless it clearly objected in writing

within 30 days, regardless of whether JRF had complied with the
CPR requirements under the Davis-Bacon Act. The Court now turns to
the question of whether NET adequately and timely objected to JRF's
invoices.

**B.   Invoice Disputes**

As previously noted, the Time and Materials sheet
incorporated into the Emergency Contract dictated that JRF's
invoices were required to "be paid within 30 days of receipt"
unless NET "clearly identified in writing within 30 days of receipt
of [an] invoice" any "disputed charges." Dkt. 42-2 at 14. This
language lays out three requirements for proper objections to an
invoice: (1) disputed charges must be clearly identified,
(2) disputes must be in writing, and (3) disputes must be made
within 30 days of receipt of the invoice.

To support its contention that it properly objected to JRF's
invoices, NET primarily points to an affidavit from Morris.[4] The
cited portions of the affidavit read, in relevant part:

> [G]rave concerns by NET had emerged about the labor
> charges, especially upon learning that JRF[] had not
> submitted weekly certified payroll reports to NET as
> required by Department of Labor standards for prevailing
> wages. We then had a lengthy series of emails, telephone

---

[4] NET also cites deposition testimony from Edwards, but that
testimony nowhere suggests that NET clearly identified disputed
charges in writing. Although Edwards did testify that he once
"prepared a reconciliation between the certified payroll and the
invoice" related to Restoration Pro Labor's work, Dkt. 49-3 at 20,
this statement does not create a genuine dispute as to whether an
adequate written objection was made to one of the final invoices.

conversations, and virtual meetings with Joseph Turnbull
of JRF[]. I also met with Joseph Turnbull at his office
in Massachusetts. We also engaged with the owner of
Restoration Pro Labor about the labor charges. . . .

We told Joseph Turnbull that NET would not formally
submit the labor costs to the Government for payment
without adequate substantiation in the form of certified
payroll reports. . . .

NET pointed out to JRF[] discrepancies and inaccuracies
[with the CPRs]. . . .

Combined with the revisions to the calculations and
unsubstantiated wage rates, these defects raised red
flags for NET. NET consistently challenged the amount of
labor costs actually incurred by and owed to
JRF[] . . . .

Dkt. 50 ¶¶ 21-22, 25, 27.

Verbal objections made during virtual meetings or telephone
calls are insufficient to satisfy the Emergency Contract's invoice
dispute clause. That leaves the "lengthy series of emails"
identified by Morris as the only cited evidence that could support
NET's position. Id. ¶ 21.

Limiting its review to emails postdating the Final Mitigation
Invoice and Final Reconstruction Invoice, which are the invoices
at issue, see supra note 2, the Court has identified two emails
worth noting. First, on December 19, 2023, Edwards emailed JRF
asking why there was "no [f]ringe" listed on a Restoration Pro
Labor CPR, in response to which JRF's office manager send Edwards
an updated copy of that CPR with the requested information. Dkt.
50-10 at 2. Because no further objection by NET appears in the
record, a reasonable jury could not conclude that this email

exchange resulted in any "clearly identified" written objection to any specific "disputed charge[]." Dkt. 42-2 at 14.

Second, on December 18, 2023, Morris emailed Turnbull listing thirteen Restoration Pro Labor employees that she could not "find on the certified payroll" from August 15 through August 20, 2023. Dkt. 50-13 at 2. No response from Turnbull appears in the record. Drawing all reasonable inferences in NET's favor, a reasonable jury could conclude that Morris's email clearly identified disputed charges -- i.e., whatever charges were associated with the work of these thirteen individuals for the six days from August 15 to August 20. But, drawing all reasonable inferences in JRF's favor for purposes of NET's cross-motion, see Vazquez-Velazquez, 73 F.4th at 51, a reasonable jury could alternatively conclude that Morris's email did not constitute an adequate objection -- for example, because it objected to a CPR (rather than an invoice). Summary judgment therefore cannot be granted for either party with respect to charges associated with these thirteen employees on these six days.

The Court has not identified any other documents in the record that could reasonably be viewed as clear written objections to disputed charges. Accordingly, JRF is entitled to summary judgment on its breach of contract claim with respect to all charges at issue, other than those associated with the thirteen employees

16

identified by Morris for the six days referenced in her email on December 18, 2023.

## II.  <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

JRF alleges that NET breached the implied covenant of good faith and fair dealing by conditioning payment on terms not contracted for to avoid paying JRF before being paid by the government.

"Under Massachusetts law, 'every contract implies good faith and fair dealing between the parties to it.'" <u>Young v. Wells Fargo Bank, N.A.</u>, 717 F.3d 224, 237 (1st Cir. 2013) (cleaned up) (quoting <u>T.W. Nickerson, Inc. v. Fleet Nat'l Bank</u>, 924 N.E.2d 696, 703 (Mass. 2010)). To prevail on a claim for breach of the implied covenant, the plaintiff must show bad faith or at least a lack of good faith on the part of the defendant. <u>See</u> <u>id.</u> at 238. The "core question" in determining a lack of good faith is "whether the alleged conduct was motivated by a desire to gain an unfair advantage, or otherwise had the effect of injuring the other party's rights to the fruits of the contract." <u>Id.</u> The "covenant cannot 'create rights and duties not otherwise provided for in the existing contractual relationship,' and instead focuses on 'the manner of performance.'" <u>Id.</u> (quoting <u>Ayash v. Dana-Farber Cancer Inst.</u>, 822 N.E.2d 667, 684 (Mass. 2005)). A lack of good faith can be inferred from the totality of the circumstances. <u>See</u> <u>Nile v. Nile</u>, 734 N.E.2d 1153, 1160 (Mass. 2000).

In support of its contention that NET breached the implied covenant of good faith and fair dealing, JRF chiefly argues that NET wrongfully planned all along to withhold payment to JRF until NET was paid by the government, without informing JRF of this intention or structuring the Emergency Contract accordingly. JRF further asserts that NET asked JRF to sign the MSA in an attempt to create a pay-when-paid arrangement that did not previously exist.

The parties agree that the Emergency Contract contains no language expressly creating a pay-when-paid obligation. JRF points out that NET provided the following response to a request for admission: "Admitted that [NET] has not provided full payment because the Government has not approved all of JRF . . . for services [sic] invoices for payment." Dkt. 42-18 at 6. NET also admitted that at the time of executing the Emergency Contract, "it had no intention of paying JRF . . . until it had received payment [from] the IRS and/or Government." Id. at 2. Where the evidence NET cites to dispute this fact conflicts with its admissions, the admissions control. See Fed. R. Civ. P. 36(b) ("A matter admitted under th[e] rule [governing requests for admission] is conclusively established . . . ."); Cement & Concrete Workers Dist. Council Welfare Fund v. Manny P. Concrete Co., 145 F.4th 204, 211 (2d Cir. 2025) (holding that factual issues conceded in Rule 36 admissions are undisputed for summary judgment purposes). It is

therefore undisputed that at the time the Emergency Contract was executed, NET intended to impose a pay-when-paid requirement.

A genuine dispute of material fact remains, however, regarding whether NET informed JRF of this intention. JRF cites Cheney's testimony that before signing the Emergency Contract, he did not inform Turnbull of a pay-when-paid requirement. NET cites other testimony from Cheney that he told JRF that before paying JRF, NET "had to get approval from the government first." Dkt. 49-1 at 12.

Further, a genuine dispute exists as to whether NET acted in good faith. Edwards testified he believed pay-when-paid requirements applied to JRF. Likewise, Morris testified that she believed federal acquisition regulations applied to JRF because the project was paid for with federal funds. JRF highlights deposition testimony that Morris directed Rodas "to see if there is something in place that will support pay-when-paid," Dkt. 42-21 at 15-16, but NET disputes that this direction was geared toward depriving JRF of the benefit of its bargain, instead claiming that Rodas simply was instructed to review the parties' contractual obligations. On this record, a reasonable jury could find either that NET attempted in bad faith to impose an extracontractual requirement in order to avoid paying JRF or that NET's refusal to pay was based on a good-faith belief that a pay-when-paid structure existed and JRF knew of it. Summary judgment thus cannot be granted

to either party on JRF's claim for breach of the implied covenant
of good faith and fair dealing.

### III. **Chapter 93A Claim**

Chapter 93A provides a remedy for unfair and deceptive trade
practices. See Mass. Gen. Laws ch. 93A, §§ 2(a), 11. To prove a
violation of Chapter 93A, a party must show "conduct that (1) falls
within the penumbra of some common-law, statutory, or other
established concept of unfairness; (2) is immoral, unethical,
oppressive, or unscrupulous; and (3) causes substantial injury to
consumers or other businesspersons." Jasty v. Wright Med. Tech.,
Inc., 528 F.3d 28, 37 (1st Cir. 2008) (cleaned up) (quoting Serpa
Corp. v. McWane, Inc., 199 F.3d 6, 15 (1st Cir. 1999)). Chapter
93A can be violated by "conduct in disregard of known contractual
arrangements and intended to secure benefits for the breaching
party," Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55
(1st Cir. 1998) (quoting Anthony's Pier Four, Inc. v. HBC Assocs.,
583 N.E.2d 806, 821 (Mass. 1991)), but "liability under Chapter
93A" is not "precluded by the absence of a contractual breach,"
Young, 717 F.3d at 240.

A party may violate Chapter 93A if contractually due payment
is withheld as a "wedge" to extract concessions from the other
party. Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d
10, 18 (1st Cir. 1985). "[W]ithholding payment based on a genuine

dispute about what a contract requires," however, "does not violate Chapter 93A." Jasty, 528 F.3d at 38.

The same disputed facts that prohibit summary judgment for either party with respect to the implied covenant of good faith and fair dealing also prohibit summary judgment on JRF's Chapter 93A claim. Without resolution of the conflicting evidence about the state of mind of NET's employees, whether NET knowingly disregarded the Emergency Contract's requirements and intended to deceptively secure benefits for itself by withholding payment cannot be established. Further, a genuine dispute remains as to whether NET withheld payment to JRF as a "wedge" to try to persuade JRF to sign the MSA in an attempt to create a pay-when-paid obligation. Pepsi-Cola, 754 F.2d at 18.

## CONCLUSION

For the foregoing reasons, JRF's motion for summary judgment (Dkt. 38) is **ALLOWED** with respect to JRF's breach of contract claim (Count I), except with respect to charges associated with the workers and dates identified by Morris's email dated December 18, 2023, see Dkt. 50-13 at 2, for which summary judgment cannot be granted to either party. JRF's motion for summary judgment (Dkt. 38) is **DENIED** with respect to JRF's claims of breach of the implied covenant of good faith and fair dealing (Count II) and violation of Chapter 93A (Count V). NET's motion for summary judgment (Dkt. 46) is **DENIED** in full. Because the contents of Turnbull's affidavit

are not relevant to the Court's resolution of the cross-motions for summary judgment, NET's motion to strike (Dkt. 61) is **DENIED** as moot.

SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge